# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

HAROLD WALKER,

        Petitioner,

    v.

GEORGE J. GIURBINO,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

1:04-cv-06452-TAG HC

ORDER DENYING AMENDED PETITION
FOR WRIT OF HABEAS CORPUS (Doc. 9)

ORDER DIRECTING CLERK OF COURT
TO ENTER JUDGMENT IN FAVOR OF
RESPONDENT

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On May 23, 2007, following consent by all parties, the matter was assigned to the United States Magistrate Judge for all purposes.  (Doc. 24).

## **PROCEDURAL HISTORY**

At the time of filing of the original petition in this case. Petitioner was in custody of the California Department of Corrections and Rehabilitation as a result of felony convictions in the Superior Court of California, County of Fresno (the "Superior Court").  On August 10, 2004, Petitioner was charged by information with the following: (1) corporal injury to a cohabitant (Cal. Pen. Code § 273.5(a)); false imprisonment by violence (Cal. Pen. Code § 236); (3) dissuading a witness by force or threat (Cal. Pen. Code § 136.1( c)(1)); (4) resisting or obstructing a police officer (Cal. Pen. Code § 148(a)(1)); (5) vandalism (Cal. Pen. Code § 594(a)); (6) false imprisonment by violence (Cal. Pen. Code § 236); (7) criminal threats (Cal. Pen. Code § 422); (8) battery (Cal. Pen. Code § 243(e)(1)); and (9) resisting or obstructing a police officer (Cal. Pen. Code § 148(a)(1).

(Clerk's Transcript on Appeal ("CT") 255-257).[1]  Following a jury trial, Petitioner was convicted on all counts except for Count Seven, i.e., criminal threats.  (CT 419-427).  Petitioner was sentenced to a prison term of three years and eight months.  (CT 429).  He was given pre-sentence credits amounting to 199 days.  (CT 430).

Petitioner filed a direct appeal in the California Court of Appeals, Fifth Appellate District (the "5th DCA").  (LD 1).  On March 29, 2006, the 5th  DCA, in an unpublished decision, affirmed Petitioner's conviction and sentence.  (LD 4).  Petitioner timely filed a petition for review in the California Supreme Court, contending, inter alia, that the trial court had erred by revoking his pro per status after initially permitting Petitioner to represent himself .  (LD 5).  On June 14, 2006, the California Supreme Court denied Petitioner's petition for review.  (LD 6).

On October 26, 2004, Petitioner filed the original petition for writ of habeas corpus in this case.  (Doc. 1).  On June 7, 2005, Petitioner filed an amended petition.  (Doc. 9).   The amended petition raised four claims: (1) judicial misconduct and bias on the part of the trial court in permitting hearsay evidence by an officer not experience and certified by proper standards; (2) unlawful revocation of Petitioner's right to represent himself; (3) violation of the right to speedy trial and due process by waiving time on behalf of Petitioner without good cause; and (4) ineffective assistance of counsel.  (Id.).

On May 17, 2007, Respondent filed a motion to dismiss, contending that Petitioner had failed to entirely exhaust his state court remedies as to Grounds One and Three in the amended petition. (Doc. 22).  On May 29, 2007, Petitioner filed his opposition to the motion to dismiss, contending that Respondent was in error and that all of his grounds had in fact been exhausted.  (Doc. 27).  On June 13, 2007, Respondent filed a response to Petitioner's opposition in which Respondent conceded that Ground One had been exhausted but contending that Ground Three, i.e., speedy trial, remained unexhausted and therefore the petition should be dismissed as a mixed petition.  (Doc. 28).

///

---

[1]The Clerk's Transcript on Appeal has been lodged as Document 24 in the Notice of Lodgement of Documents dated August 15, 2008.  (Doc. 56).  References to the Reporter's Transcript on Appeal will be cited as "RT page."  The Clerk's Transcript on Appeal has been lodged as Document 23.  (Id.).  References to the Clerk's Transcript  will be cited as "CT page."  References to all other lodged documents will be cited as "LD page."

On February 14, 2008, the Court issued an order permitting Petitioner the option of either withdrawing his unexhausted claim and proceeding on the exhausted claims or, alternatively, filing a motion to stay proceedings pending exhaustion of his unexhausted claim in state court.  (Doc. 38). On March 24, 2008, Petitioner filed a motion to withdraw his unexhausted claim.  (Doc. 42).  On April 17, 2008, the Court granted Petitioner's motion to withdraw the unexhausted Ground Three.[2] On August 11, 2008, pursuant to the Court's order, Respondent filed an answer to the amended petition.  (Doc. 55).  On August 22, 2008, Petitioner filed his traverse.  (Doc. 58).

Respondent has not expressly conceded that Petitioner's remaining three grounds for relief in the amended petition have been fully exhausted; however, neither does Respondent contend that they are unexhausted.   Accordingly, the Court will address the merits of the remaining three claims in the amended petition.

## FACTUAL BACKGROUND

Kimberly Canada had been in a relationship with Petitioner for ten years when their relationship ended in 2004.  (RT 742).  She had lived with Petitioner for nine of those years but for portions of the last year they had lived apart.  (RT 743).  In July 2004 Petitioner helped Canada move to a new home with her two children by another man.  (Id.).  Petitioner knew he would not be living with Canada, although he wanted to.  (RT 744).  After the move was completed, Canada still had some of Petitioner's belongings, including a set of tools and clothing.  (RT 745).

On July 8, 2004, after the move, Canada offered to take Petitioner to his grandmother's house, but he refused.  (RT 745).  Canada drove Petitioner to the end of the street and let him out to cool off.  (Id.).  Petitioner called her from a telephone booth ten minutes later and Canada picked him up and drove him to his grandmother's house at around 3:30 p.m.  (RT 745-746).

At approximately 11:00 p.m., while Canada was at home with her two children watching television, she heard banging on several of her outer doors.  (RT 746-747).  She heard a voice she recognized as Petitioner's demanding the return of his tools.  (RT 748).  Petitioner sounded upset, so

[2]Accordingly, at this juncture, the amended petition contains only Grounds One, Two, and Four.

1  Canada got the tools from the kitchen and tried to shove them out the kitchen door to Petitioner, but

2  the tools spilled on the step. (Id.).

3      Petitioner entered through the kitchen door and began to push Canada to the ground.  He

4  grabbed Canada's arms and push her down. (RT 748-749).  Petitioner slung Canada around by her

5  arms and flung her to the ground over and over again. (RT 748-749).  When Canada tried to go into

6  the living room, she hit the divider when Petitioner pushed her down again. (RT 749).  Canada's

7  daughter, Andrea Lawson, came out of her bedroom and Canada told her to call the police. (RT

8  749).  However, when Lawson grabbed the phone to call police, Petitioner ripped out the phone and

9  wrapped the phone cord around his hand and then put it in his pocket. (RT 749-750, 785).

10      Lawson went next door to call police while Petitioner continued to assault Canada.  Petitioner

11  told Canada, "You're hurting me by putting me out, so I'm going to hurt you." (RT 750).  Petitioner

12  grabbed Canada by her shirt and dragged her across the floor. (RT 750-751).  At one point,

13  Petitioner went into Canada's bedroom in a rage and began destroying things. (RT 784).

14      Police soon arrived and ordered Petitioner to stop, going to far as to use a taser on Petitioner,

15  but he ran through the house, out the back door, and escaped. (RT 755, 786).  As a result of this first

16  incident, Canada suffered carpet burns to her knees and lacerations to her neck and ankle, the latter

17  from being dragged across a carpet containing nails to be used in hanging pictures. (RT 751-752;

18  756; 787).  In the incident, Petitioner had torn Canada's curtains and blinds off, broken a banister

19  when dragging Canada through the house, and knocked a clock off the wall, breaking glass and

20  causing Canada's foot to dislodge the heater. (RT 759).

21      Police advised Canada and her children to stay someplace else that night. (RT 788).  Canada

22  and her family went to stay with Canada's brother. (RT 762, 788).  At 6:30 a.m. the next morning,

23  Canada and her children returned to the house and Canada prepared her son to go to school at 8:30.

24  (RT 762-763, 789).  When Canada returned to the house after her son left, Petitioner was coming in

25  the door. (RT 763).  Petitioner was in a rage and said, "I'm coming to hurt you.  Since the police

26  [are] looking for me, I'm going to have reason to go to jail." (RT 763, 790).  This scared Canada.

27  (Id.).  Petitioner pushed Canada to the ground as he came through the front door, and pulled her

28  toward her son's room. (Id.).  As Canada struggled, Petitioner dragged her by her shirt. (RT 791).

1    He pulled Canada into the bedroom and she sat on the bed as Petitioner stood over her.  (RT 764-

2    765, 792).  He would not let Canada off the bed and pushed her onto the bed every time she

3    attempted to get up.  (RT 765, 792).  Canada asked Petitioner why he was hurting her and he said

4    because she had hurt him.  (RT 765).  When Canada finally got out of the bedroom, Petitioner

5    threatened to slash her tires.  (RT 763, 792).   Police then arrived and arrested Petitioner after a

6    struggle.  (RT 766, 794).

**DISCUSSION**

**I.  Jurisdiction**

9         Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant

10   to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of

11   the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362,

12   375 n. 7, 120 S. Ct. 1495 (2000).  Petitioner asserts that he suffered violations of his rights as

13   guaranteed by the United States Constitution.  The challenged conviction arises out of the Fresno

14   County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a);

15   28 U.S.C. § 2241(d).  Accordingly, the Court has jurisdiction over this action.

16        On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

17   1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

18   Lindh v. Murphy, 521 U.S. 320, 326, 117 S. Ct. 2059 (1997);  Jeffries v. Wood, 114 F.3d 1484, 1500

19   (9th Cir. 1997)(en banc); overruled on other grounds by Lindh v. Murphy, 521 U.S. 320. The instant

20   petition was filed on October 26, 2004, after the enactment of the AEDPA, and thus it is governed by

21   the AEDPA.

**II.  Legal Standard of Review**

23        A petition for writ of habeas corpus under 28 U.S.C. 2254(d) will not be granted unless the

24   adjudication of a prisoner's claim "(1) resulted in a decision that was contrary to, or involved an

25   unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

26   the United States; or (2) resulted in a decision that was based on an unreasonable determination of

27   the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d);

28   ///

Lockyer v. Andrade, 538 U.S. 63, 70-71, 123 S. Ct. 1166 (2003); Williams v. Taylor, 529 U.S. at 412-413.

The first prong of federal habeas review involves the "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1). This prong pertains to questions of law and mixed questions of law and fact. Williams v. Taylor, 529 U.S. at 407-410; Davis v. Woodford, 384 F.3d 628, 637 (9th Cir. 2004). A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S 133, 141, 125 S. Ct. 1432 (2005)(citing Williams v. Taylor, 529 U.S. at 405, and Early v. Packer, 537 U.S. 3, 8, 123 S. Ct. 362 (2002)). A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's] precedents to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. at 141(citing Williams v. Taylor, 529 U.S. at 405 and Woodford v. Visciotti, 537 U.S. 19, 24-25, 123 S. Ct. 357 (2002)(per curium)).

A federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 520-521, 123 S. Ct. 2527 (2003)(citing Williams v. Taylor, 529 U.S. at 409). Section 2254(d)(1)'s reference to "clearly established Federal law" refers to "the governing legal principle or principles set forth by [the Supreme Court] at the time a state court renders its decision." Lockyer v. Andrade, 538 U.S. at 64; Barker v. Fleming, 423 F. 3d 1085, 1093 (9th Cir. 2005).

The second prong of federal habeas review is the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2). This prong pertains to state court decisions based on factual determinations, and provides relief only when the state court decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court. Davis v. Woodford, 384 F. 3d at 637(citing Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029, 1041 (2003)). The AEDPA requires that considerable deference be given to state court factual determinations. "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual

1   determination will not be overturned on factual grounds unless objectively unreasonable in light of

2   the evidence presented in the state-court proceeding, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S.

3   at 340.   A state court factual determination is unreasonable when it is "so clearly incorrect that it

4   would not be debatable among reasonable jurists." Jeffries v. Wood, 114 F. 3d at 1500 (citing

5   Drinkard v. Johnson, 97 F. 3d 751, 769 (5th Cir. 1996) and Moore v. Johnson, 101 F. 3d 1069, 1076

6   (5th Cir. 1996)); see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert. denied,

7   Maddox v. Taylor, 543 U.S. 1038, 125 S. Ct. 809 (2004).   When a factual determination is "more

8   debatable," the Ninth Circuit has instructed that "[a] responsible, thoughtful answer reached after a

9   full opportunity to litigate is adequate to support the judgment." Jeffries v. Wood. 114 F. 3d at 1500

10   (citing Lindh v. Murphy, 96 F. 3d at 871).

11       To determine whether habeas relief is available under § 2254(d), the federal court looks to

12   the last reasoned state court decision as the basis of the state court's decision.   Robinson v. Ignacio,

13   360 F.3d 1044, 1055 (9th Cir. 2004).   Where the state court decided the petitioner's claims on the

14   merits but provided no reasoning for its decision, the federal habeas court must independently review

15   the record to determine whether habeas corpus relief is available under § 2254(d).   Himes v.

16   Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 981-982 (9th Cir.

17   2000).   Where the state court denied the petitioner's claims on procedural grounds or did not decide

18   them on the merits, the deferential standard of the AEDPA does not apply and the federal court must

19   review the petitioner's claims de novo.   Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

20       **III.  Review of Petitioner's Claims**

21       The amended petition (Doc. 9) alleges the following three grounds for relief:

22   Ground One:   The trial court showed judicial bias against Petitioner by allowing

23                 hearsay evidence by a witness not experienced or certified by peace
                   officer standards, by allowing the prosecutor to make unauthorized
                   statements to the jury, and by denying Petitioner's motion to replace his

24                 counsel for conflict of interest.

25   Ground Two:   The trial court erred in revoking Petitioner's right to represent himself.

26   Ground Three: Petitioner was denied the effective assistance of trial counsel.

27   (Doc. 9, pp. 5-6).

28       Each of Petitioner's claims will be addressed below.

**Ground One: The trial court showed judicial bias against Petitioner by allowing hearsay evidence by a witness not experienced or certified by peace officer standards, by allowing the prosecutor to make unauthorized statements to the jury, and by denying Petitioner's motion to replace his counsel for a conflict of interest.**

Petitioner contends that the trial court showed its bias for the prosecution by permitting hearsay testimony of a police officer, by allowing the prosecution to make statements to the jury that were irrelevant or were not supported by the evidence, and by denying Petitioner's motion to replace his attorney because of a conflict of interest. (Doc. 9, p. 5).[3]   Petitioner's contentions are without merit.

The Due Process Clause guarantees a criminal defendant the right to a "fair trial in a fair tribunal," which includes a trial judge with no actual bias. Bracy v. Gramley, 117 S.Ct. 1793, 1797, 117 S. Ct. 1793 (1997). "Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the state and the accused denied the latter due process of law." Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437 (1927). Thus, the Supreme Court has held that the Due Process Clause might at times bar trial by a judge who has no actual bias in order to satisfy the appearance of justice. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623 (1955).

While the common law, statutes, and professional standards give guidance for when a judge should recuse himself, only violations of the Constitution will result in the reversal of a conviction on writ of habeas corpus. Bracy, 117 S.Ct. at 1797. In some instances, a judge's implied bias creates such a high probability of actual bias that it violates the Constitution. Withrow v. Larkin, 421 U.S. 35, 46, 95 S.Ct. 1456 (1975). For example, the Supreme court has found that Due Process requires disqualification of a judge when the judge has a direct financial interest in the outcome of a case, see e.g., Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 822-24, 106 S.Ct. 1580 (1986), where he is faced with

---

[3]These three instances are cited by Petitioner in his amended petition as a basis for Ground One's claim of judicial misconduct. In his traverse, however, Petitioner lists seven grounds for judicial misconduct: (1) allowing hearsay statements of the victim into evidence; (2) failure to have the victim testify at the preliminary hearing; (3) illegal warrantless search of the victim's house; (4) permitting police officers to assault Petitioner in the courtroom; (5) the trial court's use of prior misconduct by Petitioner to withdraw his right to self-representation; (6) false statements made by the prosecution to the jury; and (7) unlawful waiver of Petitioner's right to a speedy trial.  (Doc. 58, pp. 4-5).  The only claim listed in the traverse that was also raised in the amended petition is the sixth issue, i.e., the issue regarding the purported misrepresentations made by the prosecution to the jury.  The Court is not required to consider claims raised for the first time in a traverse.  See Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994)("A [t]raverse is not the proper pleading to raise additional grounds for relief.").  Accordingly, the Court will not consider the six "new" grounds for judicial misconduct raised for the first time in Petitioner's traverse.

1   substantial direct personal insults from a litigant, see e.g., Taylor v. Hayes, 418 U.S. 488, 501-503, 94

2   S.Ct. 2697 (1974); Mayberry v. Pennsylvania, 400 U.S. 455, 466, 91 S.Ct. 499 (1971); or where the

3   judge has undertaken significant prosecutorial and adjudicatory functions in the same case, see e.g.,

4   Murchison, 349 U.S. at 134-136.   These cases indicate that a judge's implied basis violates the

5   Constitution if the judge had "direct, personal [and] substantial" influences on the judge or some other

6   incentive for bias.  See Aetna, 475 U.S. at 822.

7       Habeas relief is limited to those cases where there is proof of actual bias, or a possible temptation

8   so severe that one might presume an actual, substantial incentive to be biased.

9   Del Vecchio v. Illinois Dept. Of Corrections, 31 F.3d 1363, 1380 (7th Cir. 1994).  What might appear

10  "bad" to an observer in hindsight might not have influenced or even had the real possibility to influence

11  the judge.  See Del Vecchio, 31 F.3d at 1371.  Several circuit courts have denied habeas corpus relief

12  where the judge had previously prosecuted the defendant in an unrelated case.

13  Del Vecchio, 31 F.3d at 1375; Jenkins v. Bordenkircher, 611 F.2d 162, 165-66 (6th Cir. 1979); Murphy

14  v. Beto, 416 F.2d 98 (5th Cir. 1969).  A judge's involvement in a prior case of the defendant, without

15  more, does not constitute a basis for bias unless there is a clear showing of favoritism or antagonism.

16  Liteky v. United States, 510 U.S. 540, 551, 114 S.Ct. 1147 (1994).  While the judge may have made

17  rulings unfavorable to the petitioner, judicial rulings alone are not a basis for concluding that the judge

18  was not impartial.  See Liteky, 510 U.S. at 551 (stating that judicial rulings alone almost never constitute

19  valid basis for finding bias).

20      A judge should disqualify himself "in any proceeding in which his impartiality might reasonably

21  be questioned," or whenever "he has a personal bias or prejudice concerning a party."

22  28 U.S.C. § 455(a), (b)(1).  Recusal also is required under  whenever a judge has a "personal bias or

23  prejudice" concerning a party.  28 U.S.C. § 144.  An objective standard is used, which requires recusal

24  whenever a reasonable person might question the judge's impartiality.  United States v. Winston, 613

25  F.2d 221, 222 (9th Cir.1980).  Although the Ninth Circuit has held that bias "may spring from many

26  sources, often extrajudicial in their origin,"  United States v. Conforte, 624 F.2d 869, 881 (9th Cir.

27  1980),  bias for purposes of the statute must be from an extrajudicial source, and not solely from

28  ///

information gained in the course of the proceedings. United States v. Grinnell Corp., 384 U.S. 563, 583, 86 S.Ct. 1698 (1966); Winston, 613 F.2d at 223.

Petitioner does not indicate which statements by prosecutors give rise to his claim of judicial misconduct, thus placing the Court in the position of having to sift through the entire record in search of facts that might support Petitioner's conclusory claim. The Court declines to undertake such a task. Petitioner must state his claim with sufficient specificity. Hendricks v. Vasquez, 908 F.2d 490, 491-492 (9th Cir. 1990); Wacht v. Cardwell, 604 F.2d 1245, 1246-1247 (9th Cir.1979); see Rule 2(c) of the Rules Governing Section 2254 Cases. It is not the province of a federal habeas court to conduct an independent review of Petitioner's state court proceedings to determine what federal claims Petitioner seeks to raise; the responsibility to assert a claim for relief unquestionably belongs to the petitioner. Adams v. Armontrout, 897 F.2d 332, 333 (8th Cir. 1990) ("We do not believe that 28 U.S.C. § 2254 or the Section 2254 Rules require the federal courts to review the entire state court record of habeas corpus petitioners to ascertain whether facts exist which support relief."); Bernier v. Moore, 441 F.2d 395, 396 (1st Cir.1971) ("Habeas corpus is a special proceeding to right wrongs, not a routine procedure to search for them, nor a means of requiring the federal courts to review, as a matter of course, state proceedings."); Williams v. Kullman, 722 F.2d 1048, 1051 (2d Cir.1983) ("Despite our firm conviction that the pleading requirements in habeas corpus proceedings should not be overly technical and stringent, it would be unwise to saddle district judges with the burden of reading through voluminous records and transcripts in every case."). Petitioner's vague reference to allowing the "prosecutor to state to the jury facts that did not support [the] charge and not supported by the evidence," without more, is grossly insufficient to permit this Court to conduct a meaningful habeas review.

Regarding the denial of Petitioner's motion to replace his appointed counsel, pursuant to People v. Marsden, 2 Cal. 3d 118 (1970), the trial judge held that hearing on September 30, 2004. Petitioner complained that his attorney had not pursued motions Petitioner had previously filed, that his attorney had waived Petitioner's speedy trial rights without his approval, that his attorney had refused to provide Petitioner with a transcript of the preliminary hearing, and that his attorney appeared to be preoccupied with other cases and was not devoting sufficient time to Petitioner's case. (RT 210-211).

///

Petitioner's counsel recounted the chronology of his representation of Petitioner, indicating that he did not entertain a good faith belief in the merits of either Petitioner's pro per Pitchess motion or his motion to suppress.  (RT 212).  Counsel indicated that he had been busy on other cases but was well aware of what needed to be done in Petitioner's case and was attempting to do it, despite the fact that Petitioner continued to file motions without counsel's knowledge.  (RT 212).  In response, Petitioner said:

> "If it's possible, [defense counsel] can come and talk to me and get a clear understanding, instead of, like I said, when he came in, he needs to–you know, like I said, I want to know what's going on with my case. He seems like he's too busy. Like he said, he just got out of trial. It seems like he's too busy, which that would be a conflict of interest, if he's too busy. I'm the client and he's with the Public Defender's Office, but I'm still supposed to be treated as a client, and I haven't been."

(RT 215).

At the conclusion of the hearing, the judge made the following ruling:

> Mr. Walker, let me explain a couple [sic] things.  First of all, the standard for granting your request is a relatively high one.  You need to show that there's been a substantial impairment on your ability to have counsel.  It's got to be impairment of your right to counsel, and that impairment has to be substantial impairment.  And whereas, I am seeing there is obviously some conflict between the two of you, it doesn't appear to me as though that conflict is insurmountable, and I'm not hearing Mr. Criego saying he's not willing to work with you.  And, in fact, the last thing you said is you were willing to have him come over and talk to you and you could talk about your case some more, so it doesn't seem to me there is an insurmountable conflict between the two of you.  He says his [sic] is willing to work on your case.  Maybe you didn't get off on the right foot with each other, but I don't believe there are legal grounds to grant your motion at this time.

(RT 216-217).

Based on the foregoing, the Court finds no basis for concluding that the trial judge engaged in judicial misconduct by denying Petitioner's Marsden motion.  The trial court amply explained its reasons for denying the motion, which were legitimate reasons, an explanation that concluded by noting that the attorney-client relationship was not irretrievably broken, as evidenced by the fact that even Petitioner had agreed that he would attempt to cooperate with his attorney during the trial.  Petitioner has presented no evidence in this regard of judicial misconduct; instead, he has merely contended that he was dissatisfied with the judge's ruling on his Marsden motion.  Dissatisfaction with a court's ruling is not evidence of judicial misconduct.  Liteky, 510 U.S. at 551

///

1    Finally, regarding the certification of the police witness, as Respondent correctly asserts, the trial

2  judge expressly asked the officer if he were a graduate of a police academy certified by the commission

3  on Peace Officers Standards in Training, and the officer indicated that he was.

4  (CT 105).   Thus, there is no factual basis for Petitioner's claim.   However, even if admitting the

5  testimony of an officer not properly certified, were, arguendo, a technical error, it would only be an error

6  of state law, not judicial misconduct of a federal constitutional dimension.   As mentioned, a claim of

7  judicial misconduct is not established by the mere fact that a judge makes erroneous rulings or rulings

8  unfavorable to the defendant.   Liteky, 510 U.S. at 551.

9    Put another way, even assuming that the trial court committed the errors of which Petitioner

10  claims, that does not establish either bias or prejudice.   In this case, there is no indication that the judge

11  had any financial interest in the outcome of Petitioner's case, nor had he been subjected to substantial

12  personal insults from Petitioner, nor had he undertaken a prosecutorial function during the course of the

13  proceedings. Habeas relief is limited to those cases where there is proof of actual bias, or a possible

14  temptation so severe that one might presume an actual, substantial incentive to be biased. See Del

15  Vecchio, 31 F.3d at 1380. There is no evidence of actual bias in this case.   Accordingly, the state court's

16  adjudication of this issue was neither contrary to nor an unreasonable application of clearly established

17  federal law.

18    **Ground Two:  The trial court erred in revoking Petitioner's right to represent himself.**

19    Petitioner next contends that the trial court erred in revoking Petitioner's pro per status and

20  precluding him from further representing himself at trial.   This contention too lacks merit.

21    On July 19, 2004, the trial court granted Petitioner's motion to represent himself pursuant to

22  Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525 (1975). (CT 11).   At the conclusion of the preliminary

23  hearing conducted on July 27 and 28, 2004, the following colloquy took place:

24    Petitioner: [Proposition] 115 states that's not hearsay–permissible.  I have case law to show
    that's not [permissible].  The officer's confession is not enough due to the fact the witness is able

25    to testify.  It says when a witness is able to testify, that's when Prop 115–if not, the witness is
    not able to testify Prop 115 which can be used in a preliminary hearing.

26

27    Court: Yes.  Officer Dupras said the following while in the bedroom.  He stated–

    Petitioner: It's not---

28

Court: –if wanted by the police, he was going to hurt her.

Petitioner: May I go back to my cell right now? I don't need–

Court: Just a moment.

Petitioner: I'll take it up on appeal.

Court: Just a moment.  That's fine, but I have to finish making my orders, and let me make those. [¶] I do find sufficient cause to bind the defendant over to answer.

Petitioner: Can I go back to my cell for the record?

Court: As to Count Eight–

Petitioner: I would like to dismiss–DA dismissed from this case.

Court: Okay.

Petitioner: Because it's already all through the jail.

Court: Let me finish making–

Petitioner: She's mad I went pro per and was out to get me.

Court: 243(e).

Petitioner: She doesn't like anyone.  She seen me in court.  It's going personally against me since I want to go pro per.  I heard that myself.  That's prosecutorial misconduct, and you agreeing is judicial–judicial conduct–misconduct.  Therefore, I–

Court: What is--

Petitioner: –take it up on appeals.

Court: –243(e)(1)?

Prosecutor: Yes, Your Honor.  The officer stated that she did not have injuries from the event that occurred on the 9th, but injuries were sustained on the 8th, so there are no injuries to justify a felony 273.5, however, the testimony was that he had pushed her several times and knocked her to the ground.

Petitioner: That's irrelevant.  The witness could have been here to testify.

Court: I see it.  I see it in the testimony.  There is insufficient cause to believe that the offense is within mentioned–Count Eight has been mentioned, defendant is guilty thereof. [¶] On that, finally, as to July 9th, I do find as to Count Nine, 148(a)(1) there is sufficient cause to believe the offense has been committed by the defendant, hold him to answer as to Count Nine.

Petitioner: I want to go to my cell.
Court: Just a minute, [petitioner]. [Petitioner] is ordered held to answer as to all counts in the complaint understanding that Count Three has been amended....

Prosecutor: Yes.

1    Court: Let's get an arraignment on that.

2    Prosecutor: Can I see–there is–there's–

3    Court: Just a moment, [petitioner]. [Petitioner].

4    Petitioner: I'm ready to go back.

5    Court: [Petitioner].

6    Petitioner: Man, I'm ready to go.

7    Court: You're going to go back, [petitioner], in just a moment.  Just a minute.

8    Petitioner: Let go of me.  Tell them to get the [profanity] away from me.  I–can you tell them to
     move away from me, Your Honor?  Tell them to move away from me.  If they move from me,
9    I will calm down.  Could you ask them to please move away from me?

10   Bailiff: Okay.  They move already.

11   Petitioner: No, they not.

12   Court: [Petitioner], calm down.

13   Petitioner: When they move away, I will calm down, sir, but until they get the [profanity] away
     from me, I won't calm down.
14
     Court: [Petitioner]--
15
     Petitioner: You're agitating me, [profanity].  I already been held to answer and this [profanity]
16   [profanity] here–

17   Court: [Petitioner]--

18   Petitioner: Get them away from me.  I will calm down.

19   Court: [Petitioner], please calm down, sir.

20   Petitioner: Your Honor, could you have them move over there?  I will calm down.  I have no
     problem calming down.
21
     Court: They're not near you right now.
22
     Petitioner: Yes, they are.
23
     Court: Okay. [Petitioner], they're not touching you and–
24
     Petitioner: They have been touching me in the first place.
25
     Court: Let me complete my order here.
26
     Petitioner: They have no business touching me in the first place.
27
     Court: [Petitioner]–[petitioner], please [calm] down, sir.
28

Petitioner: Go back over there and I will calm down.  I'm sitting down.  They have no reason to be near me.

Court: [Petitioner], calm down.

Petitioner: When they move over there, I will calm down.

Court: [Petitioner]--

Petitioner: They have no business to be near me right now.

Court: [Petitioner], please calm down.

Petitioner: When they move over there, they will–I have no problem with it.

Court: The officers have moved away from you.

Petitioner: Do I have my minute order?

Bailiff: We'll get it for you.

Court: I still have an order to make here. [¶] He is ordered held to answer. [¶] Let's set an arraignment date.  Wait a second.  I need to still set an arraignment date for him in Superior Court.

Petitioner: Why you putting on handcuffs now?

Court: Hold on.  I need a minute. [Petitioner], I need to set an arraignment date, [petitioner].

Petitioner: They don't have to pull on me.

Court: Just a moment, [petitioner].  August 16th.  Where, arraignment 96?

Prosecutor: 96.

Court: 96.  Nine o'clock in the morning. [¶] Anyting further?

Prosecutor: No, Your Honor.

Court: All right.

Petitioner: Can I get my minute order?

Prosecutor: Thank you, Your Honor.

(LD 4, pp. 211-215).

On July 29, 2004, the trial court conducted a hearing to determine whether to revoke Petitioner's _Faretta_ right to self-representation based on Petitioner's behavior the preceding day.   The judge began by denying the motion to dismiss made the previous day, which had not been ruled upon on the record "due to uncooperativeness at the end of the hearing." (CT 229).  The trial court received testimony from

several witnesses to the previous day's events. Pia Xiong, the bailiff, testified that, while the judge was making his rulings about each charge at the preliminary hearing, Petitioner told Xiong he wanted to leave and that he did not want to hear anymore. (CT 232). Xiong told Petitioner he could not leave until the judge finished the ruling, but Petitioner got louder and louder, even as Xiong tried to quiet him. (Id.). At one point, Petitioner asked Xiong whether he would shoot Petitioner if he left, Xiong indicated he would not, and eventually Petitioner took a step toward the door. (Id.). Xiong then put his hand on Petitioner's shoulder and was immediately assisted by three police officers, Dupras, Grijalva, and Martin, who were still in the audience. (Id.). Together, the officers sat Petitioner in a chair; however, he became increasingly agitated. (CT 233). Finally, when the judge had finished his ruling, the officers put handcuffs on Petitioner and escorted him out of the courtroom. (CT 233).

Sheriff's Deputy Brian Melkonian testified to an incident at the county jail that occurred in 1998 involving Petitioner. Melkonian testified that the report indicated that, during a routine search of the jail cells, Petitioner became verbally abusive toward one of the officers and, when asked to place his hands on the wall, resisted four officers, who had to wrestle him to the floor, cuff him, and drag him away. (CT 235). While in restraints, Petitioner continued to be combative. (Id.).

Deputy Jeff Hogue testified that on July 14, 2004, while Petitioner was in a court holding cell, he attempted to communicate with someone in the courtroom audience. (CT 237). Hogue told Petitioner he was not allowed to communicate with anyone in the audience, but Petitioner disregarded Hogue and continued in his efforts to communicate with someone. (Id.). Hogue subsequent wrote up a rules violation report against Petitioner. (CT 238).

The trial court noted as follows:

"The purpose of this hearing is, again, to determine whether or not [petitioner] is an appropriate candidate for an exercise of his Faretta rights.

I will note that...there are a number of incidents where [the ]record] does demonstrate that the court had to keep reminding [petitioner] to calm down and to remain in the courtroom because it is not as if he can voluntarily absent himself when he is representing himself, because there is nobody left in the courtroom to hear his matters.

And he was also very upset with the prosecuting attorney in this case and indicated... 'that's prosecutorial misconduct,' then indicating that now it is also–because the court–I was agreeing with [the prosecutor], that was also now judicial misconduct. That statement was made to the court and then, of course, attempting even to get out of the court's holding order, I could barely do that and I didn't even get a chance to rule on [petitioner's] motion to dismiss because he left

the court in such disarray.  It was unacceptable conduct and...there are a couple of times that there were vulgarities expressed on the record.  Those are clearly in the transcript at page 112, for instance, at the top.  'You're agitating me, [profanity].'  That's in the record.  In fact, –then the next line, 'I've been held to answer and this [profanity] [profanity] here,' to either members of the sheriff's department or police department, and I'm not sure which he was referring to, but he was in a quite agitated state.

With regard to the <u>Welch</u> case,[4] self-representation is not a license to disrupt these proceedings, and I saw that yesterday, and it was quite evidence not only from [the bailiff's] testimony today, but there is a record of his agitation clear back in the [1998] jail incident."

(CT 239-240).

The trial court went on to point out that, as in <u>Welch</u>, Petitioner had become belligerent and had not only turned his back on the court but had attempted to leave while the hearing was in progress.  (CT 240).  Also, as in <u>Welch</u>, Petitioner had interrupted the judge on numerous occasions, argued with the judge, and accused him of judicial misconduct.  (CT 241).  As in <u>Welch</u>, the judge concluded that, while no one factor may have been sufficient to revoke Petitioner's <u>Faretta</u> right, taken together, these factors lead to the conclusion that "self-representation would be unacceptable and disruptive."  (<u>Id.</u>).  Based on that, the trial court found that continued self-representation would lead to unacceptable disruptive behavior by Petitioner and therefore his <u>Faretta</u> right would be revoked.  (CT 243).  The court then appointed the office of the public defender to represent Petitioner in future proceedings in the case.  (<u>Id.</u>).

Petitioner raised the issue of the revocation of his <u>Faretta</u> right in his direct appeal of his conviction.  The 5th DCA, in its unpublished opinion, set forth the operative facts and its reasoning for rejecting Petitioner's claim as follows:

Here, appellant contends the record as a whole shows he displayed good conduct and a rational demeanor at the preliminary hearing–with the exception of a single, short incident, which alone was not sufficient to warrant revocation of his pro per. status.  The record, however, reflects that appellant's behavior was so disruptive that the court struggled to make its orders and even failed to make one ruling until the following day.  Appellant had to be prevented from leaving the courtroom and was restrained by the bailiff and three police officers who happened to be present in the audience.  Appellant was inconsolable and refused to comply with the court's orders to calm down.  He resorted to foul language to insult the court and other officials.  The court struggled to control appellant while attempting to fulfill its duties.  Clearly, appellant's conduct compromised the court's ability to conduct its proceedings.  Given appellant's uncontrollable behavior, his disrespectful language, and his refusal to comply with the court's directions, we conclude the court's decision to terminate appellant's right of self-representation was a reasonable exercise of its discretion.

---

[4]<u>People v. Welch</u>, 20 Cal.4th 701 (1999).

The reasonableness of the court's ruling is further underscored when the record is viewed in its entirety. Throughout the preliminary hearing, the court was patient, helpful, and respectful to appellant, allowing him to handle his case as he deemed appropriate. There is no indication that the court considered revoking appellant's pro per status at any point until appellant lost control of himself, expressly defied the court, and engaged in a physical struggle. It is evident that the court understood the importance of appellant's right of self-representation and only retracted that right when necessary to maintain control of the proceedings.

Appellant argued his behavior was not as bad as the repeated disruptions that occurred in <u>Welch</u>, and he claims his exemplary and respectful conduct during the remained of the hearing outweighed his one outburst, which he asserts was not in itself sufficient to warrant revocation of his pro per status.

(LD 4, pp. 10-11).

After analyzing the facts in <u>Welch</u> and comparing them to Petitioner's situation, the 5th DCA concluded as follows:

While the defendant in Welch may have caused more disruption in the courtroom than appellant, such a finding is not determinative. The standard is not whether a defendant's misconduct rivals that of disorderly defendants in other cases. Rather, the court must analyze each case individually. (Citations omitted.) The trial court must reasonably infer from the defendant's aggregate conduct that self-representation would cause disruption. (Citation omitted.) On appeal, if the record reasonably supports the trial court's findings, as it does here, the court's denial of the defendant's pro per status is within its discretion. (Citation omitted).

Appellant also argues that his jailhouse behavior was irrelevant to his pro per status because it did not impact the court proceedings (citation omitted). Even if we assume the 1998 jail incident was not relevant to appellant's courtroom behavior, the recent incident in which appellant refused to comply with an officer's repeated order that he cease communicating with a courtroom audience member was relevant to his ability and willingness to abide by proper courtroom protocol. Because of his disruptive and disrespectful behavior on that occasion, he was removed from the courtroom. Nevertheless, appellant's single outburst at the preliminary hearing was sufficient to justify the trial court's conclusion that appellant would be disruptive and disobedient.

(LD 4, p. 12).

With this factual and procedural background in mind, the Court now turns to an analysis of whether the state court's adjudication was contrary to or an unreasonable application of clearly established federal law.

The Sixth Amendment to the United States Constitution affords a defendant in a state court criminal proceeding an absolute right to be represented by counsel or to represent himself. <u>Faretta</u>, 422 U.S. at 807. "This right exists despite the fact that, in most cases, a defendant would be better served if represented by counsel." <u>Bribiesca v. Galaza</u>, 215 F.3d 1015, 1018 (9th Cir. 2000). While a trial judge may doubt the quality of representation that a defendant may provide for himself, the defendant

1  must be allowed to exercise his right to self-representation so long as he knowingly and intelligently

2  waives his right to counsel and is able and willing to abide by rules of procedure and courtroom protocol.

3  See McKaskle v. Wiggins, 465 U.S. 168, 173, 104 S.Ct. 944 (1984).

4          In Faretta, however, the Supreme Court went on to observe that, "[t]he right of self-

5  representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply

6  with relevant rules of procedural and substantive law." Faretta, 422 U.S. at 834 n. 46. Moreover, the

7  right to self-representation does not overcome the court's right to preserve courtroom order. U.S. v.

8  Keiser, 2008 WL 4280003 at *1 (9th Cir. Sept. 17, 2008); United States v. Mack, 362 F.3d 597, 601 (9th

9  Cir. 2004); see also Kulas v. Flores, 255 F.3d 780, 786-787 (9th Cir. 2001). A judge may "terminate self-

10  representation by a defendant who deliberately engages in serious and obstructionist misconduct."

11  Keiser, 2008 WL 4280003 at *1; Mack, 362 F.3d at 602 (quoting Faretta, 422 U.S. at 834); McKaskle,

12  465 U.S. at 173 (defendant's sixth amendment right to self-representation may be overridden if he

13  demonstrates an inability or unwillingness to "abide by rules of procedure and courtroom protocol");

14  U.S. v. Flewitt, 874 F.2d 669, 674 (9th Cir. 1989)(construing footnote 46 in Faretta to mean that "a

15  defendant's right to self-representation does not allow him to engage in uncontrollable and disruptive

16  behavior in the courtroom"); Munkus v. Furlong, 170 F.3d 980, 984 (10th Cir. 1999)(court may

17  terminate defendant's right to self-representation).

18          Here, the state court, applying the clearly established federal law as announced by the United

19  States Supreme Court, determined that Petitioner's behavior at the preliminary hearing was so disruptive

20  as to justify the revocation of his sixth amendment right to self-representation. (LD 4, p. 12). Even

21  though the single outburst by Petitioner was sufficient to reach that conclusion, the

22  5th DCA pointed out that the earlier incident in which Petitioner disregarded a deputy's order to stop

23  communicating with persons in the courtroom audience was further evidence of Petitioner's inability

24  or unwillingness to abide by proper courtroom protocol. (Id.).

25          Such a conclusion is amply supported by the record in this action. Petitioner's behavior was not

26  merely disruptive, it was violent. He shouted obscenities at various persons in the courtroom, taunted

27  the bailiff, virtually daring him to shoot Petitioner, physically attempted to leave the courtroom while

28  the judge was in the process of conducting the hearing, and violently resisted officers who attempted to

1  prevent him from leaving.  Petitioner's behavior posed not only a threat to the safety of others but also

2  to himself.  Petitioner was abusive, disruptive, discourteous, and physically combative.  He caused such

3  turmoil in the proceedings that the trial judge did not rule on Petitioner's motion to dismiss and had to

4  make the ruling at the subsequent hearing.  Moreover, disregarding the 1998 incident, the earlier incident

5  in July 2004 at the jail further justified the trial court's conclusion that Petitioner was either unable or

6  unwilling to conform to the accepted norms for proper courtroom decorum.

7       Given the fact that, should he represent himself at trial, Petitioner would most likely be placed

8  in the position of cross-examining the victim, Ms. Canada, her daughter, as well as the various police

9  officers with whom Petitioner had fought at the time of his arrest, Petitioner's behavior at the

10  preliminary hearing left the trial judge with little alternative but to appoint counsel for Petitioner if he

11  wanted to preserve any courtroom protocol at trial and protect the safety of the trial participants,

12  including Petitioner.

13       In sum, the state court applied the proper standard and reached the proper legal conclusion.  The

14  state court's adjudication was neither contrary to nor an unreasonable application of clearly established

15  federal law.  Accordingly, it must be denied.

16       **Ground Three: Petitioner was denied the effective assistance of trial counsel.**

17       Petitioner contends that he was denied the effective assistance of trial counsel under the Sixth

18  Amendment because his attorney failed to pursue motions that Petitioner had filed while representing

19  himself pro per, he failed to conduct a proper investigation into the case, and he violated attorney-client

20  privilege by telling third parties what Petitioner had said to him in confidence.  These contentions are

21  also without merit.

22       **A.  The Standard For Ineffective Assistance of Counsel**

23       In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must

24  consider two factors.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984); Lowry v.

25  Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was

26  deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as

27  the "counsel" guaranteed by the Sixth Amendment.  Strickland, 466 U.S. at 687.  To establish this, the

28  petitioner must show that counsel's representation fell below an objective standard of reasonableness.

1   Id. at 688.  The petitioner must identify counsel's alleged acts or omissions that were not the result of

2   reasonable professional judgment considering the circumstances.  Id.; United States v. Quintero-Barraza,

3   78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential, and

4   a court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable

5   professional assistance.  Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.

6   1994).

7       Second, a petitioner must show prejudice, i.e., whether counsel's errors were so egregious as to

8   deprive him of a fair trial, one whose result is reliable.  Strickland, 466 U.S. at 688, 694.  To establish

9   prejudice, petitioner "must show that there is a reasonable probability that, but for counsel's

10  unprofessional errors, the result of the proceeding would have been different.  A reasonable probability

11  is a probability sufficient to undermine confidence in the outcome."  Id.; Williams v. Taylor, 529 U.S.

12  at 391.   In so doing, the Court must also evaluate whether the entire trial was fundamentally unfair or

13  unreliable because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1345; United States

14  v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

15      The Court does not need to consider the two elements in any particular order, nor does the Court

16  need to consider both if the showing on either one is insufficient.  Strickland, 466 U.S. at 697.  A court

17  need not determine whether counsel's performance was deficient before examining the prejudice

18  suffered by the petitioner as a result of the alleged deficiencies.  Id.   The object of an ineffectiveness

19  claim is not to grade counsel's performance.  Id.  "If it is easier to dispose of an ineffective claim on the

20  ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

21  Id.

22      With these principles in mind, the Court now turns to an analysis of Petitioner's claims of

23  ineffective assistance of appellate counsel.

24  **B.  Petitioner Was Not Denied the Effective Assistance of Counsel**

25          1.  Failure To Have Pro Se Motions Heard

26      Petitioner first contends that his trial counsel was ineffective for failing to obtain a hearing on

27  motions purportedly filed by Petitioner when representing himself pro se.  Although the amended

28  petition does not specifically identify these motions, in his traverse, Petitioner indicates that the motions

include a <u>Pitchess</u> motion[5], a discovery motion, and a motion to suppress evidence gained by a Fourth Amendment violation for an illegal entry into a residence.  (Doc. 58, p. 7).

The Clerk's Transcript contains motions filed by Petitioner in <u>pro</u> <u>se</u> for discovery and to suppress his confession. (CT 30; 24).  The Court was unable to locate a <u>Pitchess</u> motion or a motion to suppress evidence obtained in an illegal search.  Petitioner's discovery motion contains general legal "boilerplate" requesting discovery in a variety of categories.  (CT 30).  Subsequent to filing these motions, Petitioner's right to represent himself was revoked and counsel was appointed to represent him. (CT 225).  At a pre-trial hearing on September 30, 2004, at which Petitioner was represented by defense counsel, Petitioner raised the issue of counsel's failure to pursue the above-mentioned motions Petitioner had filed while representing himself.  At that hearing, Petitioner complained that defense counsel had not pursued motions Petitioner had previously filed.  (RT 209).  Petitioner specifically referenced the <u>Pitchess</u> motion, a suppression motion, and a discovery motion.  (<u>Id.</u>).

Defense counsel responded as follows:

"Now, as to the motions, the majority of his motions he filed while he was prop per.  He has continued to file motions, even though my office has been appointed, and I have advised him that he not continue to file motions while we have not seen them, nor have we filed them, because we're representing him. He has, however, elected to ignore that and he has continued to send motions without sending me copies to the office of the district attorney.  The district attorney and I were trying to schedule some dates so I can look at these additional motions to see whether or not they have any merit.  I am aware he attempted to file a Pichess [sic] motion, but I do not believe there is merit to a Pichess [sic] motion.  He tried to file a motion to suppress his statements as well as other items.  I am unaware of any good faith basis for which I can file such a motion to suppress."

(RT 211-212).

The trial court ruled as follows:

"In terms of the motions that you filed, the court can't hear motions when they were filed pro per, and then your new attorney does not want to follow up on them because he feels they're not properly based on law or fact.  In other words, he has an obligation to only file motion that are properly brought before the court.  Now, after he views those motions, it might be that he has those motions to bring, or other motions he needs to bring, I don't know, because I don't know enough about your case as to which ones are proper or not.  All I'm saying is Mr. Criego has

---

[5]<u>Pitchess v. Superior Court</u>, 11 Cal.3d 531. In California, a <u>Pitchess</u> motion is normally used to obtain discovery about grievances filed against police officers by citizens, often complaints of excessive brutality or use of force.  According to <u>Pitchess</u>, in certain circumstances, a defendant may compel discovery of a police officer's personnel files, including citizen complaints.  The files and reports are first reviewed in camera by the judge, who then makes a determination whether any discoverable material relevant to the defendant's case is present and whether and how such materials will be disclosed to the defense.

1   been an attorney for quite awhile and has the legal training to know which ones are proper."

2   (RT 217).

3          As mentioned, the Court has been unable to locate in the record any motion styled as a "Pitchess"

4   motion.  Nor does it appear that the omnibus discovery motion filed by Petitioner in

5   pro se contains a request for the type of confidential materials normally requested through a Pitchess

6   motion.  Without the Pitchess motion itself, the Court has no way of knowing which police officers the

7   Pitchess motion was directed toward, nor what types of citizen complaints the motion sought discovery

8   for, nor how proof of those citizen complaints at trial would have resulted in a better outcome for

9   Petitioner.  Thus, without the motion itself, the Court is unable to assess whether trial counsel was

10  ineffective in failing to pursue it.

11         The suppression motion suffers from the same infirmity.  In his traverse, Petitioner refers to a

12  motion to suppress evidence of a non-consensual "entry into a residence."  (Doc. 58, p. 7).  However,

13  the only pro se motion to suppress in the record seeks suppression of Petitioner's confession.  It is

14  unclear what residence Petitioner is referring to, although there are references in the trial transcript of

15  a purportedly illegal search of the victim's home at the time of Petitioner's arrest.  Assuming, arguendo,

16  that the motion was directed at the police entry into Canada's home, Petitioner, does not indicate, in

17  either the traverse or the amended petition, what evidence was illegally obtained from Canada's home

18  as a result of that search, nor whether that evidence was ever presented at trial, nor how such evidence,

19  even if presented at trial, altered the outcome in such a way that it's absence would have benefitted

20  Petitioner.  Thus, Petitioner's claim as to the suppression and Pitchess motions is speculative, conclusory

21  and without foundation.[6]

22  _____

23         [6]  In his traverse, Petitioner, for the first time, alleges ineffective assistance of counsel not for failure to pursue
    motions already filed pro se by Petitioner, but for counsel's alleged failure to file additional motions apparently not previously
24  filed, e.g., discovery motions, a suppression motion to exclude evidence of an unlawful search, motions to exclude hearsay
    statements. (Doc. 58, p. 7).  However, as mentioned, the Court need not consider claims raised for the first time in a traverse.
25  Cacoperdo, 37 F.3d at 507.  Accordingly, the Court will only consider the grounds raised in the amended petition and
    responded to by Respondent.  Clearly, the claims raised in the traverse, involving motions yet to be filed by the defense, are
26  distinct from the claim of ineffective assistance raised in the amended petition involving motions previously filed by Petitioner
    while acting pro se.  Even were the Court to consider the claims raised in the traverse, they would fail for the same reason
27  as those filed by Petitioner and not pursued by counsel, i.e., lack of specificity.  Nowhere in any document does Petitioner
    indicate the precise nature of these motions, instead referring to them only as "discovery" motions or motions to exclude
28  hearsay.  The Court has no basis on which to assess counsel's performance in failing to file certain motions when Petitioner
    has not provided even  the most minimal specifics regarding the substance of those motions and how, if filed and ultimately

1    Regarding the discovery motion filed by Petitioner pro se, although it does not appear that

2    defense counsel filed a formal motion for discovery after his appointment, at the same time it does not

3    appear that the motion was denied by the trial judge.  Moreover, Petitioner has not identified any

4    discovery that was not provided to the defense that should have been provided.  Accordingly, even if

5    defense counsel were negligent in failing to file such a motion after his appointment, an argument that

6    is wholly speculative and abstract at this point, the second prong of Strickland, i.e., prejudice, has not

7    been met.

8         2.  Failure To Investigate

9    Petitioner contends that counsel was ineffective for failing to investigate unspecified matters in

10   relation to his trial.  Although neither the amended petition nor the traverse identifies the subject of this

11   failure to investigate, at the September 30, 2004 hearing, Petitioner referred to counsel's failure to

12   investigate the altercation in which sheriff's deputies struggled with Petitioner at the preliminary hearing,

13   thus leading to the revocation of his right to represent himself, as well as a failure to fully investigate the

14   potential sentences Petitioner would face should he be convicted of all charges.  (RT 214).

15   Defense counsel responded to these allegations as follows:

16   "I saw him in jail.  I handed him a copy of what I'm holding in my hand, which is a complete
     report with exposure calculations, elements of the fact, a summary report, et cetera, et cetera, et
17   cetera.  And the reason I'm saying this, because he said 13 years, but I believe the aggregate is
     nine years, and I told him the nine years, not 13 years.  I don't want someone to say I told him
18   too much time, but I did hand him this form that day.
     ...
19   And so we're clearly proper as to the items, I believe the 148 that occurred in the courtroom at
     the conclusion of the preliminary hearing, the People have agreed not to pursue those based upon
20   their plea bargain."

21   (RT 216, 217).

22   As discussed supra, in response to counsel's statements, the Court indicated as follows:

23   "...[T]he standard for granting your request [to appoint new counsel] is a relatively high one.
     You need to show that there's been a substantial impairment on your ability to have counsel.  It's
24   got to be an impairment of your right to counsel, and that impairment has to be substantial
     impairment.  And whereas, I am seeing there is obviously some conflict between the two of you,
25   it doesn't appear to me as though that conflict is insurmountable, and I'm not hearing Mr. Criego
     saying he's not willing to work with you.  And, in fact, the last thing you said is you were willing
26   to have him come over and talk to you and you could talk about your case some more, so it
     doesn't seem to me there is an insurmountable conflict between the two of you.  He says he is

27

28   granted, they might have favorably affected the outcome of the trial.

willing to work on your case. Maybe you didn't get off on the right foot with each other, but I don't believe there are legal grounds to grant your motion at this time."

(RT 216-217).

In general, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691, 104 S.Ct. at 2052; see also Seidel v. Merkle, 146 F.3d 750, 755 (9th Cir. 1998). Counsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent the client. Sanders v. Ratelle, 21 F.3d at 1456. Failure to conduct a reasonable investigation renders counsel's performance ineffective. Id. at 1456-1457 (citing U.S. v. Gray, 878 F.2d 702, 711 (3d Cir. 1989) ("Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made."). However, counsel's duty of investigation is determined by the facts that he or she knows. See Ames v. Endell, 856 F.2d 1441, 1444 (9th Cir. 1988). In determining whether counsel's assistance was ineffective for failure to investigate, counsel's "particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Wiggins v. Smith, 539 U.S. at 521-522 (quoting Strickland, 466 U.S. at 690-691).

Here, it is obvious that, contrary to Petitioner's assertions, defense counsel had indeed investigated both the issue of the potential prison sentence faced by Petitioner as well as the issue of Petitioner's criminal culpability for the altercation at the preliminary hearing. Counsel indicated that he had provided Petitioner with a detailed explanation of the potential sentence he might face if convicted on all charges. Counsel also explained to Petitioner that the prosecution was not going to charge him for his conduct at the preliminary hearing. Thus, there was nothing further to investigate regarding these two matters. Hence, counsel's implicit decision not to conduct any further investigation in these areas was reasonable. Strickland, 466 U.S. at 691.

### 3. Failure To Show That Prosecution's Witness Committed Perjury

Petitioner next claims that trial counsel failed to show that the testimony of a prosecution witness was perjured. However, Petitioner fails to identify either the witness (or witnesses) or the testimony

1  that was allegedly perjured.  Petitioner does not show how the outcome of the case would have been

2  different had trial counsel pointed out such alleged perjury to the jury.  Thus, Petitioner's claim is

3  speculative, conclusory and without foundation.  "Conclusory allegations which are not supported by

4  a statement of specific facts do not warrant habeas relief." James v. Borg, 24 F.3d 20, 29 (9th Cir.1994);

5  Jones v. Gomez, 66 F.3d 199, 204-205 (9th Cir.1995) (conclusory allegations made with no reference

6  to the record or any document do not merit habeas relief); Allard v. Nelson, 423 F.2d 1216, 1217 (9th

7  Cir.1970) (conclusory allegations in a habeas petition fail to state a claim and do not suffice to shift the

8  burden to the state to answer an order to show cause.); Campbell v. Wood 18 F.3d 662, 679 (9th

9  Cir.1994)(citing Boehme v. Maxwell, 423 F.2d 1056, 1058 (9th Cir.1970) ("An evidentiary hearing is

10  not required on allegations that are 'conclusory and wholly devoid of specifics.'").

### 4.  Disclosure of Attorney-Client Confidential Information

12  Petitioner contends that in the closing statement to the jury, his attorney indicated that his client

13  was guilty of something.  Petitioner contends that this statement was prejudicial to Petitioner because

14  he pleaded "not guilty" to all charges.  This contention is groundless.

16  During closing argument, defense counsel made the following comments:

> I find it demeaning to say that I'm going to do my job to try to get him off or convince you of something else.  I took the same oath as the prosecutor did.  That was to uphold the constitution of the United States and the State of California.  I believe I am a credible person and that I have not lost my credibility.  Because when I started this case, I told you the same thing that I'm going to tell you today, and I'm going to tell you why.  Nobody likes anyone who strikes a police officer or obstructs a police officer or strikes a woman, whether they have a relationship with that woman or not.  I told you in the beginning my client says he was guilty of misdemeanor conduct. We have not said that he was not guilty of any of the misdemeanors, including resisting arrest.

21  (RT 987-988).[7]

22  Both attorneys are allowed reasonably wide latitude in making their closing arguments.

23  Improprieties are not reversible error unless they are so gross as to probably prejudice the defendant, and

24  the prejudice is not neutralized by the trial judge.  U.S. v. Lester, 749 F.2d 1288, 1301 (9th Cir. 1984).

25  A defendant is entitled only to "reasonably effective assistance," and the ultimate question is whether

---

28  [7]Although trial counsel implies that he made a similar statement in his opening statement, that cannot be confirmed because the Reporter's Transcript does not contain the opening statements of either the prosecutor or the defense counsel.

counsel's representation "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 687.  Moreover, in determining whether Petitioner received effective assistance of counsel, the Court "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight," <u>id.</u>, but rather, will defer to counsel's sound trial strategy.  <u>Id.</u>  The Petitioner bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy.  <u>Id.</u> at 689.

Here, Petitioner has not overcome the presumption that counsel's performance was within the wide range of reasonable assistance and that she exercised acceptable professional judgment in all significant decisions made.  <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990).  Considering the multiplicity of charges against Petitioner arising from several distinct incidents over two days involving various victims, defense counsel's apparent strategy in closing argument was to attempt to ameliorate the prejudicial feelings the jury might naturally have toward an individual, such as Petitioner, who was accused of both assaulting his long-time girlfriend on two occasions as well as resisting police officers when he was arrested, by acknowledging that Petitioner's conduct may have risen to the level of a misdemeanor, but suggesting that the injuries sustained by Ms. Canada did not justify a felony conviction.  As a defense strategy, this was not unreasonable under the totality of the circumstances, although it proved ultimately unsuccessful for the defense.  Federal habeas courts cannot second-guess counsel's strategic decision to present or forego a particular defense theory or approach that appears reasonable under the circumstances.  <u>United States v. Chambers</u>, 918 F.2d 1455, 1461 (9th Cir. 1990).

In sum, the state court applied the correct standard under <u>Strickland</u> in assessing Petitioner's claim of ineffective assistance of trial counsel.  The state court's adjudication of this issue was neither contrary to, nor an unreasonable application of, clearly established federal law.  Thus, Ground Three must be denied.

## **<u>ORDER</u>**

Accordingly, for the reasons set forth above, the Court HEREBY ORDERS as follows:

1.     The Amended Petition for Writ of Habeas Corpus (Doc. 9), is DENIED with
        prejudice; and

2.      The Clerk of the Court is DIRECTED to enter judgment in favor of Respondent and

against Petitioner and to close the file.

This Order terminates this action in its entirety.

IT IS SO ORDERED.

Dated:   **October 2, 2008**                                                    **/s/ Theresa A. Goldner**

UNITED STATES MAGISTRATE JUDGE